PARKER, Justice
(dissenting).
I respectfully dissent from the holding of the main opinion. I dissented in AstraZeneca LP v. State, 41 So.3d 15 (Ala.2009), based upon what I explained there was a mistaken view of the case and a mistaken interpretation of the evidence. Because both sides in this appeal present arguments directed to the substance of my dissent in AstraZeneca, it will help to restate the pertinent portions of that dissent:
“I respectfully dissent from the holding of the main opinion. I do agree that the Alabama Medicaid Agency (‘the AMA’) cannot claim lack of knowledge that the average wholesale price (‘AWP’) was not a true average wholesale price paid, as evidenced by the fact that the AMA’s reimbursement formula for pharmacies — AWP-10%—reduced the AWP. This formula is the product in large part of studies the AMA had [had] conducted in 1985 and 1987 by two large pharmaceutical wholesalers of the average prices paid by pharmacies for prescription drugs.
“I dissent, however, from the holding in the main opinion that the AMA did not reasonably rely on the wholesale acquisition cost (‘WAC’) because the AMA also knew that the WAC was not a true price paid by wholesalers to the pharmaceutical manufacturers net of purchaser discounts. I do not believe that either the surveys performed by Alabama pharmaceutical wholesalers for the AMA or the Medicare Prescription Drug Improvement and Modernization Act of 2003, Pub.L. No. 108-173, emphasized in the main opinion, put the AMA on notice that the WAC was not a net price. There is no evidence indicating that the surveys examined the WAC, and there is no credible evidence that the 2003 Medicare Modernization Act affected the WAC for state Medicaid reimbursement.

“The 1985 and 1987 Surveys

“In a November 22, 1985, letter, then AMA Commissioner Faye Baggiano told regional director of the United States Department of Health and Human Services (‘DHHS’) Richard Morris about the results of surveys that had been performed for the AMA by two Alabama pharmaceutical wholesalers:
“ ‘Studies were accomplished for Medicaid by the two primary wholesale drug companies (Walker Drug Company and Durr-Fillauer Medical, Inc.) serving 80% of Alabama pharmacies. Copies of these studies are attached for your review. The studies indicated that the average percentage markup on WA[C] that Alabama pharmacies are paying are 7.3% (Walker) and 7.6% (Durr-Fillauer). *536 The average of these percentages is 7.45%. We are adding an additional 1% to compensate for higher cost paid by some pharmacists who are unable to take advantage of discounts. Discounts are offered only if they make timely payments (twice monthly) and/or if they are able to purchase in large volumes. With your approval, we plan to implement this program effective January 1,1985 [sic].’
“(Emphasis added.) As the Baggiano letter states, the AMA did not survey pharmaceutical wholesalers; the AMA had two pharmaceutical wholesalers survey pharmacies. These studies were by two pharmaceutical wholesalers, not of the wholesalers. The focus was the markup on the WAC paid by pharmacists; the focus was not the WAC itself.
“Another survey was conducted for the AMA in 1987 by the same two pharmaceutical wholesalers:
“‘Effective October 29, 1987, the percentage markup was increased to 9.2%. Analytical studies were once again accomplished for Medicaid by the two primary wholesale drug companies servicing Alabama pharmacies (Walker Drug Company and Durr-Fillauer Medical, Inc.). The studies indicated average percentage markups on WA[C] for Alabama pharmacies as 7.95% (Walker) and 8.45% (Durr-Fillauer). The average of these percentages is 8.2%. The additional 1% was again added to compensate for higher cost paid by pharmacists who are unable to take advantage of discounts offered.’
“(Emphasis added.)
“Thus, these two surveys, the one completed in 1985 and the one in 1987, did not study the prices the pharmaceutical wholesalers actually paid to the manufacturers — the WAC; instead, they focused on the markup on the WAC that pharmacies were actually paying to the pharmaceutical wholesalers. These studies did not put the AMA on notice that the reported WAC was not a true net price.
[[Image here]]

“The Effect of the WAC in These Cases

“The WAC was the primary basis for payment by the AMA in these cases: 88% of the claims for drugs manufactured by AstraZeneca were reimbursed based upon the WAC (State’s brief, at 62-63); 85% of the claims for drugs manufactured by GSK were reimbursed based upon the WAC (State’s brief, at 62); and 85% of the claims for drugs manufactured by Novartis were reimbursed based upon the WAC (State’s brief, at 66). The AWP-10% formula was used for reimbursement less than 1% of the time for Novartis and less than 2% for GSK and about 8% for AstraZeneca. Therefore, the WAC was the predominant basis for the AMA payments in these cases.
“This evidence is undisputed.

“Conclusion

“The AMA’s own surveys put the AMA on notice that the AWP benchmark was not a true representation of the prices actually paid by pharmacies in Alabama for drugs purchased from pharmaceutical wholesalers. The AMA’s reimbursement formula, which deducted 10% from the AWP, graphically codifies the AMA’s understanding that the AWP was not a true representation of the price paid by pharmacies in Alabama.
“In contrast, the mathematical relationship between the WAC and the AWP, the two surveys by Alabama pharmaceutical wholesalers of the markup on the WAC paid by pharmacies in Alabama, and the 2003 Medicare Modern *537 ization Act did not put the AMA on notice that the WAC was not a net figure. The AMA presented substantial evidence indicating that the 2003 Medicare Modernization Act did not apply to Medicaid or to the states, and the main opinion mistakenly draws the wrong conclusions from the two surveys and the dependent relationship of the AWP to the WAC. The evidence is undisputed that the WAC was the primary basis for reimbursement by the AMA.”
AstraZeneca, 41 So.3d at 35-40 (Parker, J., dissenting).

The Effect of the WAC in This Case

Here, the AWP is even less significant than in AstraZeneca, accounting for only two percent of the reimbursements. The WAC + 9.2% accounts for 42%, the FUL (federal upper limit) accounts for 20%, and the MAC (maximum allowable cost) accounts for 21% of the reimbursements. The FUL is established by the Centers for Medicare and Medicaid Services (“CMS”) by reviewing prices reported by manufacturers (WAC, AWP, and direct price) and setting the FUL at 150% of the lowest published price. The MAC is established by the AMA when there are at least two generic drugs equivalent to a single brand-name drug. The MAC is set at the 65th percentile of the range between the highest and the lowest published WAC.[22] Thus, the WAC is involved in the calculation of 83% of the reimbursements in this case.

The Evidence in This Case

The main opinion relies upon four pieces of evidence to conclude that the State could not show reasonable reliance that the WAC was a net figure, that is, that it was net of all discounts. I disagree with the conclusion of the main opinion that the first two pieces of evidence, taken chronologically, showed that the State knew that the WAC was not a net figure. I disagree with the conclusion of the main opinion as to the effect of the next two pieces of evidence, again taken chronologically. I will discuss each piece of evidence separately.
The November 22, 1985, letter from Commissioner Faye Baggiano to Richard Morris, then regional director of the United States Department of Health and Human Services, was analyzed and addressed in that part of my AstraZeneca dissent quoted above.
The March 13, 1998, memo from Mary Finch to then Commissioner of the AMA Gwendolyn Williams explained the calculation of the MAC. In the memo, Finch wrote: “[W]e continued to find drastic differences in what the providers were able to obtain certain products for and what we were paying-” A proper understanding of the terminology will show that the memo did not indicate that the State knew that WAC was not a net-of-discounts figure. The AMA operates under the following definitions:
“(1) Provider — Provider shall mean an institution, facility, agency, person, partnership, corporation, or association which is approved and certified by Medicaid as authorized to provide the recipients the services in the plan at the time services are rendered.
“(2) Recipient — Recipient shall mean a person who has been assigned one or more Medicaid identification numbers and has been certified by Medicaid as eligible for medical assistance under the State Plan.”
Rule 560-X-29-.01, Ala. Admin. Code (Medicaid Agency). Thus, the provider is *538 the pharmacy — the retailer selling to the customer. Therefore, Finch’s memo did not refer to variations in prices pharmaceutical wholesalers actually paid to the manufacturers — the WAC; instead it referred to variations in prices pharmacies were paying the pharmaceutical wholesalers. The memo does not show that the State knew that the WAC was not a true net figure.
On March 5, 2004, the AMA received a copy of research on the Federal Supply Schedule that expressly stated that “[publicly disclosed or listed WAC amounts may not reflect all available discounts.” Thus, the State at that point was put on notice that the WAC may not be a true net figure. Then on October 8, 2004, Mary Finch sent the first draft of her pricing study to Commissioner Carol (Herrmann) Steekel. This document shows that the State by then had concrete evidence that the WAC was not a true net figure.
Three months later, on January 26, 2005, the State filed this action against Sandoz and 78 other drug manufacturers. Thus, 10 months after receiving notice that the WAC “may not reflect all available discounts” and 3 months after initial results of its own study showed actual knowledge, the State filed this lawsuit. Such a massive, complex lawsuit is not quickly put together; it can take months of research and formulation. There is no basis in the law for holding that the preparing and filing of a lawsuit is not a reasonable response to the discovery of an alleged fraud in lieu of changing the formula. I cannot say as a matter of law that the months between the notice of a possible problem and/or the hard figures showing the problem and the subsequent filing of this lawsuit were unreasonable.

Conclusion

In summary, I do not read the November 22,1985, letter from then Commissioner Faye Baggiano to Richard Morris or the March 13, 1998, memo from Mary Finch to then Commissioner Gwendolyn Williams as “negating] the assertion that the AMA believed that WACs amounted to a final, ‘net’ price.” 100 So.3d at 535. Nor do I find that the State’s preparation and filing of a lawsuit in response to the notice it received of a potential problem, followed by a study to confirm the existence of a problem, instead of changing the EAC formula, somehow negated the State’s claim. Accordingly, I respectfully dissent.

. The effect of this formula is to provide for reimbursement of brand-name drugs at a lower price when there are generic equivalents available.